S

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

FEB 07 2001

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

THE STATE OF GEORGIA,                    )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )
                                         )
THE UNITED STATES ARMY                   )
  CORPS OF ENGINEERS;                    )
GREGORY R. DAHLBERRY, in his             )
  official capacity as Acting Secretary of )
  the United States Army; JOSEPH W.      )
  WESTPHAL, in his official capacity as  )
  Assistant Secretary of the United      )
  States Army for Civil Works;           )
LIEUTENANT GENERAL ROBERT                )
  W. FLOWERS in his official capacity    )
  as Commander and Chief of Engineers,   )
  United States Army Corps of            )
  Engineers; MAJOR GENERAL               )
  PHILLIP R. ANDERSON, in his            )
  official capacity as Division          )
  Commander, South Atlantic Division,    )
  United States Army Corps of            )
  Engineers; and COLONEL J. DAVID        )
  NORWOOD, in his official capacity as   )
  District Commander, Mobile District,   )
  United States Army Corps of            )
  Engineers,                             )
                                         )
        Defendants.                      )
_____  )

CIVIL ACTION

FILE NO. _____

2:01-CV-0026-WCO

## **COMPLAINT**

Plaintiff, the State of Georgia, files this Complaint against the Defendants as

follows:

Consent form to proceed
before a U.S. Magistrate
and pretrial instructions
received



## SUMMARY

1.

The Chattahoochee River is one of the State of Georgia's most precious natural resources, providing water supply to millions of Georgia citizens. In the 1940's, the United States Congress authorized the construction by the Defendant United States Army Corps of Engineers ("the Corps") of a reservoir on the Chattahoochee River north of Atlanta. One primary purpose of the reservoir, which became Lake Lanier, was to ensure adequate water supply for the region. In the decades since the construction of Lake Lanier, obtaining adequate water supply has become of increasing concern to the State. To address long-term water supply needs, in May, 2000, the Governor of the State of Georgia formally requested that the Corps commit to making releases from Lake Lanier in a manner that would assure a reliable water supply for the region until the year 2030. As the Corps itself has acknowledged, timing releases from Lake Lanier to provide additional water supply is by far the most environmentally protective and economically feasible alternative for meeting the region's water supply needs and can be accomplished without significant impact upon the use of the Lake for other purposes. The Corps has nevertheless not granted the request and is thereby depriving the State of full beneficial use of the Chattahoochee River and Lake Lanier in the manner mandated by the United States Congress and by the United States Constitution. The State of Georgia has accordingly filed this lawsuit seeking an order compelling the Corps to grant Georgia's request and declaring that, with respect to the allocation of water within the State, the Corps is obligated to follow state law and state regulation.

## PARTIES

### 2.

Plaintiff, the State of Georgia, brings this action in its own capacity based upon actual injury to its interests and in its representative capacity as parens patriae for the citizens of the State of Georgia based upon irreparable harm to the general welfare of the State and its citizens. The State has suffered legal and irreparable harm wrong because of the agency action described in this Complaint.

### 3.

Defendant United States Army Corps of Engineers is a branch of the United States Army under the direction and supervision of the Secretary of the United States Army and is an agency of the United States within the meaning of 5 U.S.C. § 701.

### 4.

Defendant Gregory R. Dahlberry ("Secretary Dahlberry") is the Acting Secretary of the United States Army. Defendant Joseph W. Westphal ("Assistant Secretary Westphal") is the Assistant Secretary of the United States Army for Civil Works. Defendant Lieutenant General Robert W. Flowers ("General Flowers") is the Commander and Chief of Engineers, United States Army Corps of Engineers. Defendant Major General Phillip R. Anderson ("General Anderson") is the Division Commander for the South Atlantic Division of the United States Army Corps of Engineers. Defendant Colonel J. David Norwood ("Colonel Norwood") is the District Commander for the Mobile District of the United States Army Corps of Engineers.

5.

Secretary Dahlberry, Assistant Secretary Westphal, General Flowers, General Anderson, and Colonel Norwood, acting in their official capacities, individually or collectively are responsible for and approved the acts and omissions of the Corps alleged herein and are responsible for compliance by the Corps with any decree of this Court.

## JURISDICTION

6.

This Court has jurisdiction over this action pursuant to federal law, including 28 U.S.C.A. § 1331, 5 U.S.C.A. § 701 et seq., 28 U.S.C.A. § 2201 et seq., 43 U.S.C.A. § 390b, and the Constitution of the United States of America.

## VENUE

7.

Lake Lanier and the Chattahoochee River, the bodies of water at issue in this litigation, are physically located within Dawson, Forsyth, Hall, and Lumpkin Counties, within the Gainesville Division of the Northern District of Georgia. A substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in this District and in this Division.

8.

Venue in this Court is proper pursuant to 28 U.S.C.A. § 1391(e)(2) and Local Rule 3.1 of the Northern District of Georgia Court Rules.

## FACTS

### Georgia's Regulatory Control of Water Resources in Georgia

9.

Georgia has exercised dominion and control over its water resources since its Statehood. Today, Georgia requires conservation of those resources and carefully regulates water use. For example, the Georgia Water Quality Control Act reads as follows:

> The people of the State of Georgia are dependent upon the rivers, streams, lakes, and subsurface waters of the state for public and private water supply and for agricultural, industrial, and recreational uses. It is therefore declared to be the policy of the State of Georgia that the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary reasonable usage of the waters of the state . . . To achieve this end, the government of the state shall assume responsibility for the quality and quantity of such water resources and the establishment and maintenance of a water quality and water quantity control program adequate for present needs and designed to care for the future needs of the state.

O.C.G.A. § 12-5-21(a).

10.

To ensure optimal use of Georgia's water resources while providing protection for the environment of the State of Georgia, the Georgia Water Quality Control Act authorizes the Georgia Department of Natural Resources Environmental Protection Division ("EPD") to regulate and the Board of the Department of Natural Resources to

issue regulations governing the withdrawal, diversion, or impoundment of surface waters of the State and the discharge of pollutants into the surface waters of the State.

11.

The regulation of its water resources lies at the heart of Georgia sovereignty as a State within our federal system. Central to the exercise of that sovereignty is the ability to plan for and allocate the waters of Lake Lanier and the Chattahoochee River.

### The Chattahoochee River

12.

The Chattahoochee River rises in the Blue Ridge Mountains in northeastern Georgia and flows through Atlanta to the southwest until it turns south and forms, at its western bank, the border between the States of Georgia and Alabama. Along the way, the river runs through the Georgia towns and cities of West Point, Columbus, and Fort Gaines. The river joins the Flint River at Lake Seminole at the Florida border. Upon crossing into Florida, the river becomes the Apalachicola River and empties into the Apalachicola Bay in the Gulf of Mexico. The Chattahoochee River is part of what is known as the Apalachicola-Chattahoochee-Flint ("ACF") River Basin.

13.

Except north of Lake Lanier, the flow of the Chattahoochee River is regulated by a series of dams. Lake Lanier, a Corps reservoir formed by Buford Dam, is situated about thirty-five miles north of the City of Atlanta. Construction of Buford Dam and Lake Lanier began in approximately 1950 and was substantially completed in 1957. Approximately 155 miles southwest of Lake Lanier, the Chattahoochee River begins to

form West Point Lake, a Corps reservoir formed by West Point Dam. From there, it flows through several dams operated by the Georgia Power Company before flowing into another Corps reservoir, Lake Walter F. George. Further south, the Chattahoochee River forms Lake George A. Andrews, another Corps reservoir, then joins with the Flint River at the Corps' Lake Seminole, the southernmost reservoir within the ACF River Basin.

14.

Lake Lanier is located near the headwaters of the Chattahoochee River, and the flow in the river from the Lake is small, particularly in comparison with the much higher flows downstream. The median flow in the river at Atlanta (U.S.G.S. Gage 02336000) is approximately 1,950 cubic feet per second (cfs). Near the Georgia-Alabama border, at Whitesburg, Georgia (U.S.G.S. Gage 02338000), the median flow is 3,160 cfs. At Columbus, Georgia (U.S.G.S. Gage 02341500) the median flow in the Chattahoochee River is 5,200 cfs. The median flow in the Apalachicola River at Chattahoochee, Florida (U.S.G.S. Gage 02358000) is 16,400 cfs.

15.

The Chattahoochee River is one of the most precious natural resources of the State of Georgia and is the primary source of water to millions of Georgians.

**Lake Lanier Legislation:  Congress Provides for Regional Water Supply**

16.

Representatives of the State of Georgia recognized the need for a water supply reservoir as early as the 1940's; indeed, Atlanta Mayor William B. Hartsfield began lobbying the United States Congress at that time to authorize and appropriate funds to build a reservoir north of the City of Atlanta to provide a source of water for the growing region.

17.

Congress responded to these persistent efforts and recognized the region's need for increased water supply.  As alleged in greater detail below, the authorizing federal legislation for what became Lake Lanier mandated that the Lake be operated by the Corps to meet the growing water supply needs of the region.

18.

Congress authorized construction of reservoir projects for the ACF River Basin System, including a reservoir or reservoirs on the Chattahoochee River to the north of the City of Atlanta, in the Rivers and Harbors Act of 1945, Pub. L. No. 79-14, 59 Stat. 10 (the "1945 Act"), and the Rivers and Harbors Act of 1946, Pub. L. No. 79-525, 60 Stat. 634 (the "1946 Act").

19.

The 1945 Act declares it

> to be the policy of Congress to recognize the interests and rights of the states in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control, as herein

> authorized to preserve and protect to the fullest possible
> extent established and potential uses, for all purposes, of the
> waters of the Nation's rivers; . . . and to limit the authorization
> and construction of navigation works to those in which a
> substantial benefit to navigation will be realized therefrom
> and which can be operated consistently with appropriate and
> economic use of the waters of such rivers by other users.

59 Stat. 10.

20.

The 1945 Act authorized construction of a number of water projects and refers to

these projects as follows: "The following works of improvement of rivers . . . are hereby

adopted and authorized . . . in accordance with the plans in the respective reports

hereinafter designated and subject to the conditions set forth therein." 59 Stat. 10, 11-12.

21.

With respect to the water project that became Lake Lanier and Buford Dam, the

1945 Act designates and references House Document 342, 76th Cong. 1st Sess. (1939),

which contains a report by R. Park, Colonel, Corps of Engineers, District Engineer, dated

December 6, 1938 (the "District Engineer's Report"). A true and correct copy of House

Document 342 is attached hereto as Exhibit A.

22.

The District Engineer's Report describes a plan for developing a reservoir north of

Atlanta in Roswell, Georgia to be undertaken in addition to reservoirs on the

Chattahoochee near Newnan, Georgia, and West Point, Georgia. (Exhibit A, pp. 66-87).

23.

The District Engineer's Report lists "industrial and municipal water supply" as a "principal direct benefit" of the Roswell reservoir and other proposed projects for the ACF River Basin System.  Hydropower generation also is listed as a "principal direct benefit."  The District Engineer's Report states that other benefits of the projects to be built in the ACF River Basin System, such as the benefit of railroad rate reductions, are "indirect benefits." (Exhibit A, pp. 77-81).

24.

The District Engineer's Report states, "The city of Atlanta obtains its supply for domestic and industrial use from the Chattahoochee at the present time. With the continued rapid growth of population and industry in this area the storage capacity of a large reservoir might be of benefit for an assured continuous water supply."  (Exhibit A, p. 80).

25.

Prior to actual initiation of any Roswell reservoir project, Congress enacted the 1946 Act.  The 1946 Act provides:

> [T]he following works of improvement of rivers . . . are hereby adopted and authorized to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the respective reports hereinafter designated  . . . . Apalachicola, Chattahoochee and Flint Rivers, Georgia and Florida; in accordance with the report of the Chief of Engineers, dated May 13, 1946.

60 Stat. 634, 635.

26.

The report of the Chief of Engineers dated May 13, 1946 (the "Chief of Engineers' Report") that is referenced in the 1946 Act is contained in House Document 300, 80th Congress, 1st Session (1947) ("House Document 300").  A true and correct copy of House Document 300 is attached hereto as Exhibit B.

27.

The Chief of Engineers' Report recommends construction of a reservoir on the Chattahoochee River at Buford, Georgia, rather than at Roswell, Georgia.  (Exhibit B, p. 7).

28.

The Chief of Engineers' Report states that the proposed reservoir at Buford "would afford recreational opportunities, benefit fish and wildlife conservation and make available an adequate water supply for the Atlanta area."  (Exhibit B, p. 6).

29.

The Chief of Engineers' Report references and concurs with a March 20, 1946 report of James B. Newman, Jr., Brigadier General, United States Army, Division Engineer (the "Division Engineer's Report"), which also is included within House Document 300.  (Exhibit B, pp. 10-40).

30.

The Division Engineer's Report states that the proposed reservoir at Buford would "contribute to the reduction of floods and flood damages in the Chattahoochee River

valley, and would ensure an adequate water supply for the rapidly growing Atlanta metropolitan area." (Exhibit B, p. 28).

### 31.

The Division Engineer's Report states that the "minimum release [to ensure a flow at Atlanta of not less than 650 second-feet] may have to be increased somewhat as the area develops . . . [and] the benefits to the Atlanta area from an assured water supply for the city and the Georgia Power Company's steam plant would outweigh any slight decrease in system power value." (Exhibit B, p. 28).

### 32.

No "primary" or "secondary" authorized purposes of Lake Lanier are referenced or discussed in the 1945 Act, the 1946 Act, the District Engineer's Report, the Division Engineers' Report, or the Chief of Engineer's Report.

## The Corps Follows Congress' Mandate and Operates Lake Lanier as a Water Supply Reservoir

### 33.

As alleged in greater detail below, since the construction of Buford Dam and Lake Lanier, the Corps has repeatedly taken the position that water supply is an intended and authorized purpose of Lake Lanier.

### 34.

A Report by D.A. Raymond, Colonel, Corps of Engineers, District Engineer, dated November 30, 1961 (the "Raymond Report") is contained in House Document 570, 87th Congress, 2nd Session (1962) ("House Document 570"). A true and correct copy of

excerpts of House Document 570 containing portions of the Raymond Report is attached hereto as Exhibit C.

35.

The Raymond Report states that "primarily because of Buford Dam, there is ample water supply on the Chattahoochee River below Atlanta at all times for all foreseeable municipal and industrial needs." (Exhibit C, pp. 30-31).

36.

In 1990, Congress passed the Water Resources Development Act of 1990, Pub. L. No. 101-640 (the "1990 Act"), which directs Secretary of the Army to "conduct a study of the operations of reservoir projects which are under the jurisdiction of the Secretary" and "to identify the purposes for which each such project is authorized; and . . . to identify the purposes for which each such project is being operated."

37.

Pursuant to the 1990 Act, the Corps published the document entitled Authorized and Operating Purposes of Corps of Engineers Reservoirs, dated July 1992 and reprinted in 1994, a true and correct copy of excerpts of which is attached hereto as Exhibit D.

38.

In Authorized and Operating Purposes of Corps of Engineers Reservoirs, the Corps lists "Water Supply" as both an "authorized purpose" and an "operating purpose" of Lake Lanier. (Exhibit D, p. E-94).

39.

The Corps' Institute for Water Resources, Water Resources Support Center prepared the December 1998 Water Supply Handbook (the "Water Supply Handbook") to serve as a comprehensive desk reference for the Corps and non-Corps entities involved in water supply planning and management. A true and correct copy of excerpts of the Water Supply Handbook is attached hereto as Exhibit E.

40.

The Water Supply Handbook states that municipal and industrial water supply is an authorized purpose and an operating purpose of Buford Dam and Lake Lanier. (Exhibit E, p. C-2).

41.

The Corps internet site, www.sam.usace.army.mil/op/rec/lanier/history.html. (the "Web Site"), an excerpt of which is attached as Exhibit F, states of Lake Lanier that "[w]hen full, the authorized purposes including power production, water supply, navigation, and flood control could be fully realized."

42.

The Web Site states, "Lake Lanier would become the primary water source for the metropolitan Atlanta area." (Exhibit F).

43.

Corps Regulation ER 1110-2-240, which is codified in the Code of Federal Regulations at 33 C.F.R. § 222.5, contains a list of Corps projects and lists "Municipal and/or Industrial Water Supply" as a "Project Purpose" of Buford Dam and Lake Lanier.

44.

Corps Regulation ER 110-2-240, 33 C.F.R. § 222.5, also provides that the Corps is to develop water control plans and regulation manuals for reservoirs, locks, dams, and other major water control structures and interrelated systems.

45.

Pursuant to Corps Regulation ER 110-2-240, the Corps developed the "Apalachicola-Chattahoochee-Flint Basin Water Control Plan" dated October 1989 (the "Water Control Plan"). A true and correct copy of excerpts of the Water Control Plan is attached hereto as Exhibit G.

46.

The Water Control Plan, under the heading "Water Control Objectives," states,

> Principal purposes for which the Federal projects are operated include fish and wildlife management, flood control, hydropower, navigation, recreation, water supply and water quality. The balancing of water control operations to meet each of these purposes varies between the individual projects and time of year. Operation of the projects is usually performed in a manner which represents a consideration of these sometimes competing purposes and, whenever possible, reservoir operations are managed to accommodate these purposes in a complimentary [sic] fashion.

(Exhibit G, p. 6).

47.

Also pursuant to Corps Regulation ER 110-2-240, the Corps developed the "Apalachicola Basin Reservoir Regulation Manual Appendix B, Buford Dam (Lake Sidney Lanier) Chattahoochee River, GA" dated February 1991 (the "Lake Lanier

Reservoir Regulation Manual"). A true and correct copy of excerpts of the Lake Lanier Reservoir Regulation Manual is attached hereto as Exhibit H.

48.

The Lake Lanier Reservoir Regulation Manual states, "Buford is a multiple purpose project with principle purposes of flood control, navigation, hydropower, recreation, and water supply." (Exhibit H, p. B1-2).

## There is No Prescribed Allocation of Conservation Storage in Lake Lanier Among Project Purposes

49.

Neither the Rivers and Harbors Acts of 1945 and 1946, nor the Corps Reports that they reference, prescribe an allocation of the conservation storage capacity in Lake Lanier among hydropower, water supply, or other benefits of the project.

50.

The Lake Lanier Reservoir Regulation Manual does not state any specific allocation of storage capacity at Lake Lanier exclusively for hydropower or water supply.

51.

According to the Water Supply Handbook, discussed above, the Corps of Engineers divides the storage area within a multipurpose reservoir into three pools: the flood control pool, the conservation (or operating) pool, and the inactive (or sediment) pool. Corps policy provides that the flood control pool is normally kept empty to allow for storage of storm water when the need arises. Water stored within the inactive or sediment pool is not used to meet reservoir project purposes. Water stored within the

conservation pool is used to meet all project purposes, such as water supply, water quality, hydropower, recreation, and navigation. (Exhibit E, p. 4-1).

## Principles of Federalism Dictate that Lake Lanier be Operated As a Water Supply Reservoir as Mandated by Congress

52.

The general power to regulate water resources is vested in the several states, subject to the limited power of the United State Congress to enact preemptive legislation under the United States Constitution.

53.

Congress has not preempted state power to regulate water resources within the state. To the contrary, Congress has directed agencies of the federal government to assist the states in meeting water supply needs. Congress has specifically reserved for the states authority to manage water resources.

54.

For example, the Flood Control Act of 1944 states: "it is declared to be the policy of the Congress to recognize the interests and rights of the States in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control." 33 U.S.C. § 701-1. This same language is contained in the 1945 Act and the 1946 Act.

55.

The Water Supply Act of 1958 states: "The Federal Government should participate and cooperate with States and local interests in developing such water supplies in

connection with the construction, maintenance, and operation of Federal navigation, flood control, irrigation, or multiple purpose projects." 43 U.S.C. § 390b(a).

56.

A parallel provision for development of water supplies in the western United States reflects this same deference to state law. The Reclamation Act of 1902, which governs certain water projects developed by the Department of Interior, provides:

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof."

43 U.S.C. § 383.

57.

The federal Clean Water Act provides that the federal government's role in regulating waters of the United States does not impair the rights of several states' to allocate those waters:

> It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter [the Clean Water Act]. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall cooperate with State and local agencies to develop comprehensive

solutions to prevent, reduce and eliminate pollution in concert
with programs for managing water resources.

33 U.S.C. § 1251(g).

### 58.

The Corps itself has recognized the states' authority to manage water resources.

### 59.

The Water Supply Handbook states, "The Corps will not become involved in resolving conflicts among water users concerning rights to use stored water, but will look to responsible state agencies to resolve such conflicts." (Exhibit E, p. 2-5).

### **Georgia's Water Supply Needs from Lake Lanier and the Chattahoochee River**

### 60.

As alleged in greater detail below, Georgia's growing regional water supply needs require gradually increased water supply withdrawals and releases from Lake Lanier through the year 2030.

### 61.

As of 1957, when construction of Buford Dam and Lake Lanier was substantially completed, Lake Lanier and the Chattahoochee River upstream of Peachtree Creek (collectively, the "Lanier/Chattahoochee System") supplied water to meet the demands of approximately 800,000 people.

### 62.

Cobb, Dawson, DeKalb, Forsyth, Fulton, and Gwinnett Counties currently rely upon the Lanier/Chattahoochee System for water supply. Hall and Lumpkin Counties are

Lake Lanier riparians that are projected as likely needing to rely on water withdrawn from Lake Lanier to meet their future water supply needs.

63.

Today, approximately 2.7 million people rely upon the Lanier/Chattahoochee System for their water supply.

64.

According to projections made by EPD, the Atlanta Regional Commission ("ARC"), and the Georgia Mountains Regional Development Center ("Georgia Mountains RDC"), the number of people who will rely upon the Lanier/Chattahoochee System for their water supply is expected to rise to 4 million by the year 2030.

65.

Exhibit I hereto contains a list prepared by EPD of all municipal and industrial withdrawal permit holders that rely upon the Lanier/Chattahoochee System, and their 1999 water withdrawals.

66.

The average rate of water withdrawn directly per day from Lake Lanier in 1999 was 131.54 million gallons per day ("mgd").

67.

The average rate of water withdrawn directly from the Chattahoochee River between Buford Dam and Peachtree Creek in 1999 was 277.70 mgd.

68.

The highest monthly average amount of withdrawals from Lake Lanier and from the Chattahoochee River between Buford Dam and Peachtree Creek are approximately 30% higher than the annual average.

69.

An estimated annual average withdrawal of 705 mgd will be needed to meet the expected 2030 water use needs of those who will depend upon the Lanier/Chattahoochee River System for water supply. Of this 2030 total of 705 mgd, 297 mgd will be required to meet the needs of those who will withdraw directly from Lake Lanier. The remaining 408 mgd will have to be withdrawn from the Chattahoochee River between Buford Dam and Peachtree Creek. Sufficient quantities of water will not be available in the Chattahoochee River for such withdrawals unless the Corps makes the necessary releases from Lake Lanier.

70.

To meet peak day demands in 2030, up to 450 mgd will be withdrawn from Lake Lanier and up to 615 mgd will be withdrawn from the Chattahoochee River upstream of Peachtree Creek.

### Georgia's Stream Flow Requirements for Water Quality

71.

In addition to the need for water to meet municipal and industrial water supply demands, the region relies heavily on the Chattahoochee River (and releases from Lake Lanier) to assimilate properly treated wastewater discharges.

72.

Since 1992, EPD, in conjunction with the U.S. Environmental Protection Agency, ARC, the U.S. Geological Survey, and the National Park Service, has spent more than $5 million developing the best, most scientifically reliable water quality model ever in Georgia, the Chattahoochee River Model.

73.

The Chattahoochee River Model allows EPD to perform hourly simulations of the behavior of the Chattahoochee River and determine the expected value of a host of water pollutants (e.g., biochemical oxygen demand, organic nitrogen, ammonia, organic phosphorus, and fecal coliform) under varying conditions within the watersheds that contribute flow to this segment of the Chattahoochee River.

74.

The Chattahoochee River Model shows that even with state-of-the-art wastewater treatment for all local governments discharging to the River in the metro Atlanta area, flows of approximately 750 cubic feet per record ("cfs") at the Peachtree Creek confluence with the Chattahoochee River will be needed to help ensure that water quality standards are met in the River below Atlanta.

**Allowing for Increased Withdrawals and Off-Peak Releases from Lake Lanier is the Most  Environmentally Protective and Economically Viable Alternative for Meeting Georgia's Regional Water Supply Needs**

75.

Numerous water supply studies for the region dating back to the early 1960's have consistently concluded that the Lanier/Chattahoochee River System is the most

environmentally-protective and economically viable alternative for meeting the water needs of the region.

### 76.

A resolution of the United States Senate Public Works Committee adopted on March 2, 1972 authorized the Metropolitan Atlanta Water Resources Study ("Study"). According to the resolution, the Study was authorized to examine, among other things, "regional water supply," "wastewater management facilities," and "water quality control," and was to be coordinated with the State and local governments.

### 77.

The Study was commenced in 1973. The Corps was the lead government agency for the Study. In a 1974 Memorandum of Agreement, the Corps established the Executive Group to provide policy guidance and help assess plans and alternatives for regional water supply. The Executive Group consisted of representatives of the Corps, the Georgia Department of Natural Resources, the ARC, the Georgia Mountains RDC, and the United States Environmental Protection Agency. In addition, other teams of government representatives and citizens assisted in the Study.

### 78.

The Corps issued the Final Report for the Study in 1981. A true and correct copy of excerpts of the Final Report is attached hereto as Exhibit J.

### 79.

The Final Report states that "[a] major objective of the study was to develop a long-range water supply plan for the Atlanta region." (Exhibit J, p. I-6).

80.

According to the Final Report, several alternatives for ensuring adequate water supply for the Atlanta region out of the Lanier/Chattahoochee River System were considered during the Study. Among the alternatives given final consideration were increasing off-peak releases from Buford Dam at the expense of peak hydropower releases and building a reregulation reservoir downstream of Buford Dam, both of which alternatives were concluded to result in net positive economic benefits.

81.

The Executive Group and the District Engineer of the Corps further recommended that "[r]ecreation, water supply, and water quality control should be acknowledged as full project purposes of the Lake Lanier project along with power, flood control, and navigation, and that all of these purposes be fully considered in future decisions affecting the use or operation of the project." (Exhibit J, pp. IX-3, IX-4, IX-6).

82.

Following the publication of the Final Report, the Corps studied the two preferred alternatives further using a computer model. As documented in the Corps 1989 Draft Post-Authorization Change Report ("the Draft PAC Report"), the Corps concluded that increasing off-peak releases and decreasing peak hydropower releases was the most efficient and economic alternative for meeting the region's water supply needs. True and correct copies of excerpts of the Draft PAC report are attached hereto as Exhibit K.

### Georgia's Water Supply Request

#### 83.

Because of the critical need for an assured water future for the State of Georgia and with the goal of obtaining a firm commitment that historic water supply allocation practices would continue, on February 28, 2000, the State of Georgia submitted a memorandum to the Honorable Joseph W. Westphal, Assistant Secretary of the Army. A true and correct copy of this memorandum is attached hereto as Exhibit L. In the memorandum, Georgia stated the basis for its demands and requested that the Corps commit to managing Lake Lanier to meet Georgia's long-term water supply needs.

#### 84.

At meetings between the Governor of Georgia and Assistant Secretary Westphal on March 7, 2000, and between representatives of Georgia and Assistant Secretary Westphal and other representatives of Corps of Engineers Headquarters on April 18, 2000, Georgia further explained the basis for its demands.

#### 85.

By letter dated May 16, 2000, a true and correct copy of which is attached hereto as Exhibit M, the Governor of Georgia requested final agency action by the Corps pursuant to the Administrative Procedure Act in the form of a response to the request by the State of Georgia relating to the operation of Lake Lanier. The Governor of Georgia's May 16, 2000 letter specifically requested that the Corps take the following actions (hereinafter the "Water Supply Request"):

- Allow municipal and industrial water withdrawals from Lake Lanier to increase as necessary from the 1999 annual average of 131 mgd to the projected 2030 annual average of 297 mgd.

- Release sufficient water from Buford Dam to provide for municipal and industrial water withdrawals from the Chattahoochee River below the dam and upstream of Peachtree Creek to increase as necessary from the 1999 annual average of 278 mgd to the projected 2030 annual average of 408 mgd.

- Provide certainty for these municipal and industrial water withdrawals by entering into long-term contracts with the State of Georgia or municipal and industrial water users.

- Release sufficient water from Buford Dam for environmental quality purposes so that, in addition to meeting the needs described above, there is a minimum instantaneous flow of 750 cfs in the Chattahoochee River just upstream of its confluence with Peachtree Creek in the months of October through May, 850 cfs in the months of June and September, and 950 cfs in the months of July and August, starting in 2001.

- To the extent that hydropower generation at Buford Dam is reduced over time by operating to meet the needs described above and the Corps of Engineers must assess fees from municipal and industrial water users to ensure that the Federal government's project costs are repaid, that the Corps account for return flows, conjunctive use with other project purposes, and separable costs/remaining benefits in calculating such fees, and that the Corps charge such fees only as municipal and industrial water withdrawals increase over time.

### The Corps Fails to Grant Georgia's Water Supply Request

86.

As of February 6, 2001, the Corps has not granted or denied the Water Supply Request. There are no administrative remedies available to the State that the State has not already exhausted.

**Georgia's Need for Immediate Corps Action**

87.

Those who rely upon the Lanier/Chattahoochee River System need the assurance of additional water supply in order to plan and to grow for the future.

88.

Planning for development of new water supply reservoirs generally must begin 10 to 20 years before the demand must be met because the process is complex and fraught with uncertainty.

89.

Metro Atlanta area counties and municipalities are increasingly faced with uncertainty in both planning and financing because of the uncertainty caused by the Corps' refusal to grant Georgia's Water Supply Request. If this process continues any longer, it will begin to have a significant adverse economic impact upon the State of Georgia and the Southeastern United States.

**COUNT I -- ADMINISTRATIVE PROCEDURE ACT**

90.

Plaintiff incorporates and re-alleges by reference the allegations of Paragraphs 1 - 89 above as though fully set forth herein.

91.

The Corps' failure to grant the Water Supply Request constitutes final and reviewable agency action pursuant to 5 U.S.C. § 704.

92.

The State of Georgia has suffered legal wrong because of the Corps' action and is entitled to judicial review of the Corps' action under federal law, including 5 U.S.C. § 702.

93.

The State of Georgia has exhausted its available administrative remedies.

94.

All conditions precedent to the State of Georgia's right to bring this action have occurred or been satisfied.

95.

As set forth in greater detail below, by failing to grant the Water Supply Request, the Corps has unlawfully withheld and unreasonably delayed agency action pursuant to 5 U.S.C. § 706(i).

96.

As set forth in greater detail below, the Corps' failure to grant the Water Supply Request is arbitrary, capricious, an abuse of discretion, not in accordance with law; contrary to constitutional right, power, privilege and immunity; in excess of statutory authority; and without factual or legal substantiation.

97.

The Corps has the statutory authority and obligation to grant the Water Supply Request pursuant to the authorities cited above. By not granting the Water Supply

Request, the Corps has not acted in accordance with law and its action is arbitrary and capricious.

98.

The Corps has acknowledged with respect to Lake Lanier and other federal projects that it has the statutory authority to manage water resources under its control in a dynamic fashion to meet changing needs. By failing to do so with respect to the Water Supply Request, the Corps has acted arbitrarily and capriciously and otherwise not in accordance with law.

99.

If the basis for the Corps' failure to grant the Water Supply request is that granting the Water Supply Request would have a severe effect on authorized project purposes or would involve major structural or operational changes within the meaning of the Water Supply Act, then the Corps has erred as a matter of law and its factual findings, if any, have no support in the record.

100.

If it is the Corps' conclusion that a denial of the Water Supply Request is warranted because granting such a request would exceed the Corps' self-imposed 50,000 acre-feet/15% of conservation storage threshold, then such a conclusion is not in accordance with law and without observance of procedure required by law because it constitutes an unlawful irrebutable presumption.

101.

In its failure to grant the Water Supply Request, the Corps has been influenced by the pending water allocation disputes among Alabama, Georgia and Florida. The Corps, however, has no statutory or constitutional authority to make interstate water allocation decisions or to allow interstate water allocation issues influence its decision-making process. The Corps' failure to grant the Water Supply Request, therefore, is not in accordance with law and is in excess of its statutory and constitutional authority.

102.

The Corps' failure to grant the Water Supply Request constitutes a violation of federal law and the Corps' internal regulations because the net national economic development benefits ("NED") of granting the Water Supply Request greatly exceed the net NED benefits of denying the request.

103.

Congress has specifically reserved to the several states the authority to manage the states' water resources except when such management is in violation of or conflicts with federal law. By not respecting the State of Georgia's decisions with respect to the management of the Chattahoochee River and Lake Lanier, the Corps has exceeded its own statutory mandate, has acted contrary to the State of Georgia's constitutional right, power and privilege, and has acted otherwise not in accordance with state and federal law.

104.

The State of Georgia is therefore entitled to an order setting aside the Corps' decision and compelling the Corps to grant the Water Supply Request.

## **COUNT II -- DECLARATORY JUDGMENT -- FEDERAL LAW**

105.

The State of Georgia incorporates and re-alleges by reference the allegations of Paragraphs 1 - 104 above as though fully set forth herein.

106.

Upon information and belief, the Corps claims that it lacks the authority to grant the Water Supply Request without additional congressional authorization.

107.

The State of Georgia believes that the Corps does possess the authority to grant the Water Supply Request without additional congressional authorization.

108.

An actual, justiciable controversy exists that is appropriate for judicial determination.

109.

This controversy will be resolved immediately and definitely by a judicial declaration that the Corps has the authority to act without additional congressional authorization.

110.

The State of Georgia requires guidance to protect it from uncertainty and insecurity with respect to the propriety of some future act or conduct. Without the guidance of this Court, the State's interests, and the interests of its citizens, might reasonably be jeopardized.

111.

The State of Georgia is therefore entitled to a declaration that the Corps possesses the authority, without additional congressional authorization, to grant the Water Supply Request.

## COUNT III -- DECLARATION JUDGMENT – STATE LAW

112.

Plaintiff incorporates and re-alleges by reference the allegations of Paragraphs 1 - 111 above as though fully set forth herein.

113.

The federal government has certain specified powers to regulate and exploit navigable waters pursuant to the Commerce Clause of the Constitution of the United States of America.

114.

The power granted to Congress (and subsequently to the Corps by Congress) in the Constitution does not include any general power to regulate water use or allocation, nor does such limited power override state water rights and interests.

115.

The State of Georgia has a property interest in its water and has assumed its sovereign responsibility to regulate use of its water.

116.

The State of Georgia's property interest and sovereign authority is not extinguished by the Corps' power to regulate, operate or maintain water projects within the State.

117.

Indeed, the federal statutes authorizing the actions of the Corps in this project specifically recognize the interests and right of the State of Georgia in managing the development of the watersheds within its borders.

118.

The Corps does not have the authority to allocate the water resources of the State of Georgia.

119.

It is the position of the State of Georgia that the Corps in its operation of Lake Lanier is subject to the law of the State of Georgia and appropriate regulation by State officials. It is further the position of the State of Georgia that, under state law, the Corps must comply with the Water Supply Request. It is further the position of the State of Georgia that the Corps generally must comply with state law except insofar as compliance with state law would conflict with federal law.

120.

Upon information and belief, it is the position of the Corps that the Corps is not subject to state law and need not comply with state law with respect to the Water Supply Request even if compliance therewith would not conflict with federal law.

121.

An actual, justiciable controversy exists that is appropriate for judicial determination.

122.

This controversy will be resolved immediately and definitely by a judicial declaration.

123.

The State of Georgia requires guidance to protect it from uncertainty and insecurity with respect to the propriety of some future act or conduct. Without the guidance of this Court, the State's interest, and the interests of its citizens, might reasonably be jeopardized.

124.

The State of Georgia is entitled to a declaration that the Corps is subject to state law that does not conflict with federal law and that the Corps, as a matter of state law, must grant the Water Supply Request.

## COUNT IV - - DECLARATORY JUDGMENT - - CONSTITUTION OF THE UNITED STATES

125.

Plaintiff incorporates and re-alleges by reference the allegations of Paragraphs 1-124 above as though fully set forth herein.

126.

A federal agency may exercise only those powers expressly delegated to it by the Congress and the Congress, in turn, can only exercise those powers delegated to it by the United States Constitution.

127.

Federal statutes are to be construed to avoid constitutional issues. The federal statutes authorizing the construction and funding of Buford Dam and Lake Lanier, therefore, should be construed so as require allocations for water supply to meet Georgia's future water supply needs. Should these federal statutes be construed as not authorizing such allocations for water supply, however, then the federal statutes on their face or as applied by the Corps are unconstitutional because they exceed the power of Congress under the Commerce Clause and effect an unconstitutional taking of property without just compensation and without due process of law.

128.

An actual, justiciable controversy exists that is appropriate for judicial determination; this controversy will be resolved immediately and definitely by a judicial declaration.

129.

The State of Georgia requires guidance to protect it from uncertainty and insecurity with respect to the propriety of some future act or conduct. Without the guidance of this Court, the State's interest, and the interests of its citizens, will reasonably be jeopardized.

130.

The State of Georgia is entitled to a declaration that, if applicable federal law does not require the Corps to grant the Water Supply Request, then such federal law on its face, or as applied by the Corps, is unconstitutional.

WHEREFORE, Plaintiff, the State of Georgia, prays that this Court:

A.    Order the Corps to grant the Water Supply Request and to operate Lake Lanier in accordance with the Water Supply Request;

B.    Declare that the Corps' refusal to grant the Water Supply Request violates federal law, state law, and the United States Constitution;

C.    Grant the State of Georgia appropriate interim injunctive relief necessary to obtain adequate water supply releases from Lake Lanier pending the outcome of this litigation;

D.    Award the State of Georgia attorneys fees and costs; and

E.    Award such other and further relief as the Court may deem just and proper to protect the interests of Plaintiff and the citizens of the State of Georgia.

Respectfully submitted this 7th day of February, 2000.

THURBERT E. BAKER
GA Bar No. 033887
Attorney General

ROBERT S. BOMAR
GA Bar No. 066400
Deputy Attorney General

ISAAC BYRD
GA Bar No. 101150
Senior Assistant Attorney General


CLAY C. LONG
GA Bar No. 457000
Special Assistant Attorney General
BRUCE P. BROWN
GA Bar No. 064460


Long Aldridge & Norman, LLP
One Peachtree Center
Suite 5300
303 Peachtree Street
Atlanta, GA 30308
(404) 527-4000

CHARLES T. DUMARS
Special Assistant Attorney General
Law & Resource Planning Associates, P.C.
Albuquerque Plaza
201 Third Street, N.W., Suite 1370
Albuquerque , NM  87102
(505) 346-0998

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES ARMY | ) | CIVIL ACTION |
| CORPS OF ENGINEERS; | ) | |
| GREGORY R. DAHLBERRY, in his | ) | FILE NO. _____ |
| official capacity as Acting Secretary of | ) | |
| the United States Army; JOSEPH W. | ) | |
| WESTPHAL, in his official capacity as | ) | |
| Assistant Secretary of the United | ) | |
| States Army for Civil Works; | ) | |
| LIEUTENANT GENERAL ROBERT | ) | |
| W. FLOWERS in his official capacity | ) | |
| as Commander and Chief of Engineers, | ) | |
| United States Army Corps of | ) | |
| Engineers; MAJOR GENERAL | ) | |
| PHILLIP R. ANDERSON, in his | ) | |
| official capacity as Division | ) | |
| Commander, South Atlantic Division, | ) | |
| United States Army Corps of | ) | |
| Engineers; and COLONEL J. DAVID | ) | |
| NORWOOD, in his official capacity as | ) | |
| District Commander, Mobile District, | ) | |
| United States Army Corps of | ) | |
| Engineers, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **EXHIBITS TO COMPLAINT**

ATLANTA:4275592.2